*Deon T. Campbell v. State of Maryland*, No. 2164, September Term, 2023. Opinion by Ripken, J.

**CRIMINAL LAW — MIRANDA RIGHTS — VITIATION OR NULLIFICATION**
Following a proper recitation of *Miranda* rights, when a person being interrogated asks for clarification regarding those rights, an officer cannot make an incorrect statement of law or intentionally mislead or trick the person being interrogated. Making such a statement vitiates or nullifies the previously proper *Miranda* advisement. Where an officer provides clarifying information in a legally correct fashion, the *Miranda* advisement and any subsequent waiver of those rights remains proper.

**CRIMINAL LAW — BALANCING UNFAIR PREJUDICE WITH PROBATIVE VALUE — MD RULE 5-403 — JAIL UNIFORM**
To determine whether unfair prejudice of a video of a defendant wearing jail clothes outweighs the video's probative value, trial courts should conduct the Rule 5-403 balancing test. Additionally, as part of the unfair prejudice prong of the balancing test, trial courts should examine: (1) whether the State has a demonstrable need to introduce the evidence; (2) if shown to the jury, whether the evidence implies that the defendant has a prior criminal record; and (3) when introduced at trial, whether the evidence was introduced in a manner such that it does not draw particular attention to the source or implication of the evidence.

**CRIMINAL LAW — BALANCING UNFAIR PREJUDICE WITH PROBATIVE VALUE — MD RULE 5-403 — JAIL UNIFORM**
A video containing a defendant wearing a prison or jail uniform is not inherently prejudicial and does not raise the same concerns under the Sixth Amendment as when the defendant appears in the courtroom before the jury in jail or prison clothing.

**CRIMINAL LAW — BALANCING UNFAIR PREJUDICE WITH PROBATIVE VALUE — MD RULE 5-403 — CRIME SCENE AND AUTOPSY PHOTOGRAPHS**
A trial court does not abuse its discretion in admitting crime scene or autopsy photographs, even when they depict graphic content, if the danger of unfair prejudice is not outweighed by the probative value of that evidence.

**CRIMINAL LAW — EVIDENCE — AUTHENTICATION — VIDEO EVIDENCE**
Video evidence can be authenticated using a variety of methods, including self-authentication, circumstantial evidence, or a combination of methods.

**CRIMINAL LAW — SUFFICICENCY OF THE EVIDENCE — PREMEDITATION FOR FIRST-DEGREE MURDER**
Circumstantial evidence which demonstrated the intensity of a victim's killing at close range following brief conversation was sufficient to establish premeditation for first-degree murder.

Circuit Court for Baltimore County
Case No. C-03-CR-22-001477

_____

DEON T. CAMPBELL

v.

STATE OF MARYLAND

_____

Berger,
Nazarian,
Ripken,

JJ.

_____

Opinion by Ripken, J.
_____

Filed: October 2, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

In June of 2023, Deon Tyvon Campbell ("Appellant") was tried before a jury in the Circuit Court for Baltimore County on multiple charges related to the murder of Tarik Purcell ("Purcell"). Appellant was found guilty of first-degree murder among other offenses, for which he was sentenced to life without the possibility of parole. Appellant noted this timely appeal.

## ISSUES PRESENTED FOR REVIEW

Appellant submitted the following issues for our review:[1]

I.      Whether the circuit court erred in declining to suppress statements that Appellant made during an interrogation.

II.     Whether the circuit court abused its discretion when it admitted a video of Appellant in a jail uniform and multiple pieces of evidence which depicted the murder and death of Purcell.

III.    Whether the circuit court abused its discretion when it determined that video footage was authenticated.

---

[1] Reorganized, consolidated, and rephrased from:

1. Did the trial court abuse its discretion by admitting unauthenticated videos purporting to show the shooting and events prior to it?

2. Did the trial court err by admitting [Appellant's] statement following erroneous advice under *Miranda*?

3. Did the trial court abuse its discretion by admitting a prejudicial video of [Appellant] in jail clothes?

4. Did the trial court abuse its discretion by admitting numerous graphic pieces of visual evidence depicting [Purcell's] injury?

5. Was the evidence insufficient to convict [Appellant] of first-degree murder?

IV.    Whether the evidence was sufficient to convict Appellant of first-degree murder.

For the reasons to follow, we shall affirm Appellant's convictions.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

On May 16, 2021, Purcell was shot in the eye outside of The Spot Hookah Lounge ("The Spot") in Baltimore County at 1:48 a.m. Officer Carlone ("Ofc. Carlone")[3] was the first officer to arrive at the scene. Ofc. Carlone arrived at The Spot approximately one minute after receiving a call indicating that a shooting had occurred. Upon his arrival, Ofc. Carlone described the scene as a "chaotic situation" in which everyone was "screaming and yelling." He also indicated that there was a large crowd of people surrounding Purcell and that the people in the crowd were "irate" and "hostile." Due to this behavior, Ofc. Carlone worked with another officer to keep the crowd separated from Purcell, attempting to secure the scene. Soon thereafter, the paramedics arrived. Again, due to the unruly behavior of the people in the crowd, the paramedics immediately removed Purcell from the scene—as opposed to the practice of stabilizing and treating a person before moving them—and drove Purcell to the hospital while rendering aid and attempting to stabilize him. Upon arriving at the hospital, Purcell was pronounced deceased.

---

[2] The following facts were adduced at trial.

[3] The record does not contain Ofc. Carlone's first name.

Prior to the departure of the ambulance from The Spot, many patrons had quickly left the scene.[4] Hence, the officers were unable to identify witnesses, and, additionally, limited pieces of physical evidence were recovered from the scene.[5] Due to the limited physical evidence, Detective Christopher Needham ("Det. Needham")—who, as the lead investigator on the case, was assigned to developing a suspect—began checking for surveillance cameras that could aid in the investigation. Law enforcement officers discovered multiple security cameras on the interior and exterior of The Spot and recovered serial numbers from those cameras.

Approximately nine months passed. In June of 2021, following the issuance of a search warrant, Det. Needham, his partner, Detective Eric Dunton ("Det. Dunton"), and other Baltimore County police officers obtained electronic video footage from Nest, the company that held the video footage of the surveillance cameras at The Spot ("the Nest footage"). The Nest footage was comprised of multiple video clips: two video clips of the interior of The Spot which portrayed people dancing, drinking, and smoking hookah; and video footage of the exterior of The Spot which portrayed the murder itself and depicted the death of Purcell. Based on the Nest footage, law enforcement obtained a photograph of a license plate, searched the Motor Vehicle Administration's records, and connected the

---

[4] Ofc. Carlone confirmed that "there were people . . . running in and out of the Hookah lounge," and that "some cars . . . were leaving rapidly[.]"

[5] The only pieces of physical evidence recovered were: one shell casing, one bullet "jacketing," one bottle of lotion, and one cellphone, which was later determined to be irrelevant to the investigation. No weapon was recovered.

license plate information to the registered owner of the vehicle, Kari Brown ("Brown").[6] In November of 2021, Det. Needham interviewed Brown which aided him and Det. Dunton in developing Appellant as a suspect.

In February of 2022, Det. Needham conducted a recorded custodial interrogation with Appellant at the Baltimore County Police Department. During the interrogation, Det. Needham showed Appellant video clips of the Nest footage. The interrogation lasted approximately two-and-a-half hours. Appellant identified himself to Det. Needham in the interior video clips; however, while watching the exterior clips, he declined to identify the individual who appeared to be the same person as himself.[7]

In April of 2022, Appellant was indicted by a grand jury for eight counts related to the events that occurred at The Spot, including the murder of Purcell. Following multiple motions hearings, the case proceeded to a four-day jury trial in June of 2023. At trial, the

---

[6] Additionally, in June of 2021, Det. Needham received a call from the Baltimore City Police. This call prompted him and Det. Dunton to travel to the Baltimore City Police Headquarters Homicide Unit, and to interview Brandi Burrows ("Burrows"). Burrows provided Dets. Needham and Dunton with information that aided in their investigation and prompted them to seek an interview with Brown.

[7] For example, in response to Det. Needham's question, "Do you recognize that person?" Appellant responded that he did not, and also stated, "That's not me, I can't tell who it is. If you think it's me, then (inaudible)." Det. Needham continued, "What did you just tell me? You are the third person in that car." Appellant replied, "No, I am not." Det. Needham then tried to ask the same question regarding whether the person who appeared to be Appellant, was in fact Appellant—as he was wearing the same clothes from the interior video—to which Appellant repeatedly replied, "I don't know."

State presented seven[8] witnesses; Appellant did not testify and called no witnesses. The jury found Appellant guilty of four offenses: first-degree murder (Count I); use of a firearm in the commission of a crime of violence (Count III); wear, carry, and transport of a loaded handgun upon a person (Count VI); and illegal possession of a regulated firearm after a disqualifying conviction (Count VIII).[9]

Appellant moved for a new trial and requested a hearing. The State opposed Appellant's motion. In January of 2024, the court held a hearing on the motion. Following arguments from both Appellant and the State, the court denied Appellant's motion for a new trial and proceeded to sentencing. The court sentenced Appellant to the following periods of incarceration: life without the possibility of parole for first-degree murder, twenty years for using a firearm in a commission of a crime of violence, and five years for possessing a regulated firearm after having a disqualifying conviction. The second and third sentences were to run concurrent with the first-degree murder sentence. This timely appeal followed.[10] We incorporate additional facts as they become relevant to the analysis.

---

[8] Only six of the seven witnesses provided testimony at trial. Burrows had signed a plea agreement pertaining to a criminal case in Baltimore City in which she agreed to testify in Appellant's trial as a witness for the State. When the State called Burrows as a witness, she invoked her Fifth Amendment right not to testify.

[9] At the outset of the trial the court granted the State's request, without objection from the defense, to enter a *nolle prosequi* as to counts II (first-degree assault) and IV (wear, carry, and transport a handgun in a vehicle upon public roads) of the indictment.

[10] "In a criminal action, when a timely motion for a new trial is filed pursuant to Rule 4-331(a), the notice of appeal shall be filed within 30 days after the later of (1) entry of the judgment or (2) entry of a notice withdrawing the motion or an order denying the motion." Md. Rule 8-202(b). Here, the court entered the verdict on June 16, 2023. Appellant filed a

I. **THE CIRCUIT COURT DID NOT ERR WHEN IT DECLINED TO SUPPRESS THE STATEMENTS APPELLANT MADE WHILE BEING INTERROGATED.**

### A. Additional Facts

*i. Det. Needham's Custodial Interrogation of Appellant*

In February of 2022, Det. Needham conducted a custodial interrogation of Appellant. Det. Needham explained to Appellant that he wanted to speak with Appellant regarding "something" with which Appellant "might be able to help" law enforcement. Det. Needham retrieved a "Baltimore County Police Department *Miranda* Rights Waiver" form ("the *Miranda* Waiver") and placed it on the table in front of where Appellant was seated. Det. Needham slid his chair closer to Appellant so that Appellant could read the form as Det. Needham read Appellant his *Miranda* rights out loud from the form. Subsequently, Det. Needham read aloud each of the five *Miranda* statements, pausing after every statement to ensure Appellant understood. Det. Needham received a verbal affirmation from Appellant as to each of the five rights. Det. Needham proceeded to read the following statement, which appeared on the form in bolded uppercase text: "I have read and understand this explanation of my rights. My decision to waive these rights and be interviewed is free and voluntary on my part." Det. Needham then asked Appellant, "Does that make sense?" In response, the following colloquy ensued:

> [Appellant]: So I'm waiving, like I'm waiving all these rights?

---

timely motion for new trial on June 23, 2023. The circuit court denied Appellant's motion and sentenced him on January 10, 2024, and Appellant filed a notice of appeal that same day.

[Det. Needham]: Yes. But if at some point you want to stop --

[Appellant]: I still got these rights?

[Det. Needham]: Oh, yeah.

[Appellant]: Okay.

[Det. Needham]: Oh, yeah, yeah, yeah. You have them, but you're still going to -- you understand them and you're still going to talk to me.

[Appellant]: Okay.

[Det. Needham]: That's all that means.

[Appellant]: Okay. Yes.

[Det. Needham]: If at some point you don't feel like talking any more and you want to go --

[Appellant]: Okay, yeah.

[Det. Needham]: I'll still get you a cigarette.

[Appellant]: Okay. Yeah, I'm good.

[Det. Needham]: And then we'll roll.

[Appellant]: Okay.

[Det. Needham]: I'm just going to get you to sign right there for me. Take your time.

Appellant signed the *Miranda* Waiver.[11] and engaged in a conversation with Det. Needham regarding his whereabouts and the events that occurred at The Spot on May 16, 2021. Their conversation lasted for approximately two-and-a-half hours.

---

[11] The *Miranda* Waiver noted the following advisements:
1. You have the absolute right to remain silent.
2. Anything you say can and will be used against you in a court of law.
3. You have the right to talk with a lawyer at any time before or during any questioning.

During the interrogation, Det. Needham showed Appellant portions of the video clips from the Nest footage. The first video clip was from a camera in the interior of The Spot; it was in color and depicted patrons dancing, drinking, and smoking hookah. The second video clip was from a camera on the exterior of The Spot, facing the parking lot; it was in black and white and depicted the murder of Purcell. While watching the first video clip and talking with Det. Needham, Appellant identified himself and admitted to being at The Spot on the night of the murder of Purcell. After Appellant identified himself in the first video clip, Det. Needham identified Appellant in the second video clip based off Appellant's distinguishing characteristics, i.e., his hair and the manner in which he walked. While watching the second video clip and talking with Det. Needham, Appellant did not identify himself outside, stating, "That's not me, I can't tell who it is. If you think it's me, then (inaudible)." Appellant further explained that although he was at The Spot that evening, he did not remember anything from that night because of the amount of alcohol he consumed.

### ii. Motion to Suppress and Subsequent Hearing

Prior to trial, counsel for Appellant filed a motion to suppress the statements he made while being interrogated by Det. Needham and requested a hearing. Appellant sought suppression because, he alleged, Det. Needham's answer to his clarifying question regarding his *Miranda* rights was an improper statement of the law. In particular,

---

4. If you want a lawyer and cannot afford one, you can request the court to appoint a lawyer prior to any questioning.
5. If you agree to answer questions, you may stop at any time and no further questions will be asked of you.

8

Appellant's counsel took issue with the statement: "You have them, but you're still going to -- you understand them and you're still going to talk to me." Appellant's counsel further argued that Det. Needham's remarks were an improper statement of the law that nullified his prior *Miranda* advisement to Appellant, and thus the entirety of the recorded statement had to be suppressed. The State opposed the motion.

In November of 2022, the court conducted a hearing ("the suppression hearing"). At the suppression hearing, the court heard testimony from Det. Needham and received evidence, including: the video recording of the interrogation, which was played for the court, a transcript of the recording, and a photocopy of Appellant's signed *Miranda* Waiver.

The circuit court heard arguments from both counsel for Appellant and the State. Appellant contended that Det. Needham's words were a misstatement of law "because by signing that [*Miranda* W]aiver" Appellant had "in fact abandoned" his *Miranda* rights, so it was not a correct statement of the law to say "that he would still have these rights." The State contended that Det. Needham's statement was not a misstatement of law because Det. Needham was "clarifying that the waiver of the rights would mean that [Appellant] was prepared to speak" with Det. Needham.

The court denied the motion to suppress. The court noted that a defendant "can invoke the rights, even having waived them." The court continued that in its estimation,

> the detective read [Appellant] his rights properly per Miranda. [Appellant] asked a short clarifying question. The detective answered it in a legally appropriate fashion, indicating that [Appellant] could stop at any time. And [Appellant] having acknowledged understanding those rights[,] agreed to

waive [them] both orally and in writing, and only then did the detective begin questioning after a valid Miranda Warning.

At trial in June of 2023, the State sought to admit a video recording of the statements Appellant made during the custodial interrogation. Appellant's counsel stated that Appellant was renewing his previous objections from the suppression hearing. The court admitted the video, noting counsel's "standing objection" to the previously raised issues. The video was then played in open court.

## B. Party Contentions

Appellant contends that the circuit court committed legal error in denying the motion to suppress the video of the interrogation. Appellant does not contend that he was improperly *Mirandized*. Rather, Appellant asserts that Det. Needham correctly read and reviewed with Appellant his *Miranda* rights, yet upon Appellant asking a clarifying question as to his rights, Det. Needham's answer was a misstatement of law. Appellant contends that when Det. Needham stated, "You have them, but you're still going to -- you understand them and you're still going to talk to me[,]" Det. Needham improperly told Appellant that "he still retained his rights even as he was speaking to [Det. Needham], which indicated that he was not actually waiving the rights to silence and counsel[,] and implied that he would therefore not be incriminated by statements he made." Thus, Appellant argues, pursuant to *State v. Luckett*, 413 Md. 360 (2010) and *Lee v. State*, 418 Md. 136 (2011), Det. Needham's statement vitiated or nullified the previously legally correct *Miranda* advisement.

The State contends that the circuit court did not commit legal error in denying the motion to suppress. The State asserts that Det. Needham's answer to Appellant's clarifying question "did not undermine the scope or validity" of Appellant's *Miranda* rights because Det. Needham's statement was not an incorrect statement of the law. The State, also relying on *Luckett* and *Lee*, argues that Det. Needham's answer to Appellant's clarifying question did not render Appellant's *Miranda* waiver constitutionally invalid.

### C. Standard of Review

This Court reviews a trial court's ruling on a motion to suppress using a blended standard of review. In reviewing the factual findings from the suppression hearing, "[w]e defer to the motion court's factual findings and uphold them unless they are shown to be clearly erroneous." *Madrid v. State*, 247 Md. App. 693, 714 (2020) (quoting *Gonzalez v. State*, 429 Md. 632, 647 (2012), in turn quoting *Lee v. State*, 418 Md. 136, 148 (2011)) (further citation omitted), *aff'd* 474 Md. 273 (2021). Factual findings are not clearly erroneous so long as there is competent and material evidence in the record that supports those findings. *Givens v. State*, 459 Md. 694, 705 (2018). In reviewing the motion court's legal conclusion as to the *Miranda* warning, we follow a *de novo* standard, "undertak[ing] our own independent constitutional appraisal of the record by reviewing the law and applying it to the facts of the present case." *Thomas v. State*, 429 Md. 246, 259 (2012) (internal quotation marks and citation omitted); *see Madrid*, 474 Md. at 309 ("[A]n appellate court reviews without deference a trial court's ultimate determination as to whether *Miranda* was violated[.]").

Our review of the denial of a motion to suppress is "limited to the record of the suppression hearing." *Madrid*, 474 Md. at 309 (quoting *Thomas*, 429 Md. at 259). "We view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion, here, the State." *Gonzalez*, 429 Md. at 647 (quoting *Lee*, 418 Md. at 148).

### D. Analysis

#### i. Legal background

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court of the United States held that before law enforcement may interrogate a person in custody, they must advise that person of their constitutional rights to "give force to the Constitution's protection against compelled self-incrimination[.]" *Florida v. Powell*, 559 U.S. 50, 59 (2010). "[T]he Court established in *Miranda* 'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.'" *Id.* (quoting *Duckworth v. Eagan*, 492 U.S. 195, 201 (1989)). Although the Supreme Court has "not dictated the words in which the essential information must be conveyed," *id.* at 60, prior to any questioning, law enforcement must inform the suspect that

> he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 479.

The rights afforded by *Miranda* can be waived. *See id.* at 475. For a waiver to be constitutional, the State "must show that the waiver was knowing, intelligent, and voluntary[.]" *State v. Luckett*, 413 Md. 360, 379 (2010) (internal quotation marks and citation omitted). When inquiring into the adequacy of the waiver, there are "two distinct dimensions" we heed:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Lee*, 418 Md. at 150 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)) (internal quotation marks omitted).

The Court in *Miranda* "recognized that a waiver of the rights afforded by the warnings can be undermined by words or actions on the part of the police." *Id.* Since *Miranda*, courts have applied its principles and its progeny to hold that

> after proper warnings and a knowing, intelligent, and voluntary waiver, the interrogator may not say or do something during the ensuing interrogation that subverts those warnings and thereby vitiates the suspect's earlier waiver by rendering it unknowing, involuntary, or both. Such action on the part of the police violates *Miranda* and, as a consequence, requires suppression of any statements the suspect makes thereafter during the interrogation.

*Id.* at 151–52. The Supreme Court of Maryland has had two occasions to address such an issue. *See Luckett*, 413 Md. at 363; *see also Lee*, 418 Md. at 141. We briefly discuss each case.

13

In *Luckett*, after properly advising the defendant of his *Miranda* rights, a detective made "'clarifications' and 'explanations'" of those rights. 413 Md. at 381. When the detective advised the defendant of his right to speak with an attorney and to have an attorney present while being questioned, the detective added, "'that's about this case, specifically.'" *Id.* After providing the defendant with an example of the type of exchange that would not be considered an interrogation afforded protection under *Miranda*, he then continued, "'Okay, if we discuss any matters outside of the case, you don't need a lawyer present at all period.'" *Id.* Rather than inform the defendant that anything he said during the interrogation could incriminate him, the detective "repeatedly advised" the defendant that "any of his statements that were not directly related to 'the case' . . . were outside the purview of the right to counsel and, impliedly at least, not subject to being used against" the defendant. *Id.* at 382. The defendant moved to suppress his post-waiver statements, arguing that detective's statements failed to convey to the defendant his right to have an attorney present during an interrogation. *Id.* at 373–74.

The Supreme Court of Maryland held that the detective's "repeated 'explanations' of what *Miranda* [did and did not] protect during interrogation were incorrect as a matter of law." *Id.* at 382. The Court explained that "a suspect is not properly informed of his or her *Miranda* rights when a statement of those rights, however correct the statement may be, is nullified by other incorrect statements concerning those rights." *Id.* at 384. Thus, the Court held that in the event of a nullification, "the *Miranda* advisements are constitutionally infirm, a purported 'waiver' of those rights is constitutionally invalid, and any statement the police obtain from the suspect during the ensuing interrogation violates

14

*Miranda*." *Id.* Because the Court found that the defendant's prior *Miranda* waivers were vitiated by the detective's misstatement of law, the Court affirmed the suppression of the defendant's statements. *Id.*

*Luckett* has factual similarities to *Lee*. In *Lee*, after a detective properly advised the defendant of his *Miranda* rights, the detective interrogated the defendant. *Lee*, 418 Md. at 142–43. Approximately an hour into the interrogation, the defendant asked the detective whether their conversation was being recorded. *Id.* at 144. The detective replied, "'This is between you and me, bud. Only me and you are here, all right?'" *Id.* The Court held that the detective's words "on their face impl[ied] confidentiality and thereby directly contradict[ed] the advisement that 'anything you say can and will be used against you in a court of law.'" *Id.* at 156. The Court explained that in reviewing *Miranda* advisements, "our focus is not on what the detective intended, but rather on what a layperson in [the defendant's] position would have understood those words to mean." *Id.* (citing *Burbine*, 475 U.S. at 423–24).

The Court held that the detective's affirmative misrepresentation of the defendant's *Miranda* rights nullified the defendant's prior *Miranda* waiver. *See id.* at 157. Because the circuit court denied the defendant's motion to suppress and because the State "made substantive use" of the defendant's statements that "were taken in violation of *Miranda*," the Court ordered a new trial. *Id.* Expounding upon its holding in *Luckett*, the Court in *Lee* explained that when a detective makes a statement that subverts the prior proper *Miranda* advisement, such a statement undermines a defendant's ability to knowingly and

15

intelligently waive the defendant's rights, bringing into question the constitutionality of the waiver. *Id.* at 156–57.

### ii. The motion court's factual findings were not clearly erroneous

Here, the motion court's factual findings were not clearly erroneous because there was competent and material evidence to support the court's findings. *See Givens*, 459 Md. at 705. The court found that after a proper advisement of the *Miranda* rights, Appellant "asked a short clarifying question." The court found that Det. Needham answered Appellant's question "in a legally appropriate fashion," indicating that Appellant "could stop [the interrogation] at any time." The court found that Appellant, "having acknowledged understanding [his *Miranda*] rights[,] agreed to waive [them] both orally and in writing, and only then did [Det. Needham] begin questioning after a valid *Miranda* warning." In arriving at these factual findings, the motion court had heard testimony from Det. Needham and received into evidence a photocopy of Appellant's *Miranda* Waiver signed by Appellant; the video of Det. Needham's interrogation of Appellant; and a transcript of Det. Needham's interrogation of Appellant.

During Det. Needham's testimony, the motion court heard Det. Needham testify concerning the beginning of the interrogation wherein he advised Appellant of his *Miranda* rights. After the video of the interrogation was admitted and played for the court, Det. Needham testified that the video was an accurate representation of the *Miranda* advisement and the colloquy that he had with Appellant when Appellant asked the clarifying question. Det. Needham further testified that he had been a homicide detective for ten years, and that this was not his first occasion advising a defendant of their *Miranda* rights. Moreover, Det.

16

Needham testified as to his understanding of how the Baltimore County Police Department *Miranda* Rights Waiver form operates, explaining that when a defendant decides to not waive their rights, they do not sign the form. It is clear from the record that the court relied on this material and competent evidence in arriving at the factual finding, as the court stated, "having viewed . . . that portion of the statement, as well as . . . having [had] the opportunity to review the transcript, it is clear that [Appellant] was . . . advised strictly and properly of his rights pursuant to *Miranda*." Viewing this evidence in the light most favorable to the State as the prevailing party on the motion, *see Gonzalez*, 429 Md. at 647 (quoting *Lee*, 418 Md. at 148), the motion court's factual findings were not clearly erroneous.[12]

> ### iii. Appellant's Miranda *rights were not vitiated by Det. Needham's answer to Appellant's clarifying question*

In performing our own independent constitutional appraisal, the totality of the circumstances surrounding the interrogation supports the view that a reasonable layperson in Appellant's situation would have understood that he retained his *Miranda* rights and

---

[12] In denying Appellant's motion to suppress, the motion court found this case "akin" to *Wimbish v. State*, 201 Md. App. 239 (2011) because there, while law enforcement was reading the defendant his *Miranda* rights, the defendant asked "what about my lawyer." The issue in *Wimbish* was whether the defendant's requests for an attorney were unequivocal and unambiguous. 201 Md. App. at 256. Although that issue is distinct from the one Appellant raises here, the defendant in *Wimbish* also asked clarifying questions of the detective. *See id.* at 257–59 (asking questions regarding the meaning of "waiver"). In *Wimbish*, the detectives answered the defendant's questions in a legally correct manner, making no misstatements of law. *See id.* Thus, although not directly analogous, we see no issue with the court's comparison of the case *sub judice* to *Wimbish*. *See Robeson v. State*, 285 Md. 498, 502 (1979).

could stop the interrogation at any time. *See Lee*, 418 Md. at 148, 150. We therefore agree with the motion court's holding that Appellant's *Miranda* rights advisement was not vitiated or nullified. After being properly advised of his *Miranda* rights, Appellant asked a clarifying question, inquiring whether in signing the *Miranda* Waiver he was waiving all his rights. Det. Needham responded "Yes." Det. Needham also explained that "if at some point" Appellant wanted to stop the interrogation, Appellant could communicate that desire to Det. Needham and that Appellant would still have his rights. Following this explanation, Appellant signed the written *Miranda* waiver. We agree with the motion court's finding that Det. Needham's statement "[y]ou have them, but you're still going to -- you understand them and you're still going to talk to me" was not a misstatement of the law, but rather that Det. Needham was answering Appellant's question in a "legally appropriate fashion" because it is true that a defendant still has *Miranda* rights while speaking with a detective. Where a defendant waives *Miranda* rights, that waiver does not mean those rights are gone forever; instead, the protections afforded by *Miranda* are only waived for the purpose of that specific conversation or interrogation, and those protections can resume upon an invocation from the defendant. *See, e.g.*, *Ballard v. State*, 420 Md. 480, 483–85, 491 (2011) (demonstrating that a defendant was properly *Mirandized*, agreed to waive his rights, and then while later being interrogating, invoked his right to remain silent); *In re Darryl P.*, 211 Md. App. 112, 169 (2013) ("The common invocation procedure, moreover, applies in the pre-waiver context precisely as it does in the post-waiver context."). Thus, Det. Needham's answer to Appellant's question concerning the concept of waiver did not vitiate

18

the constitutionality of Appellant's earlier waiver because it was not an incorrect statement of the law. *Contra Lee*, 418 Md. at 157; *Luckett*, 413 Md. at 382.

Additionally, the facts in this case are distinguishable from those in both *Lee* and *Luckett*. In *Lee*, responding to a clarifying question, a detective made a misstatement of law, one that directly contradicted the *Miranda* advisement. *See Lee*, 418 Md. at 156 (detective's statement "This is between you and me, bud. Only me and you are here, all right?" directly contradicted the advisement that "anything you say can and will be used against you in a court of law"). In *Luckett*, responding to a clarifying question, a detective provided an improper explanation concerning the scope of a defendant's right to counsel during an interrogation. *See Luckett*, 413 Md. at 382–83 (detective's statement that the defendant's *Miranda* rights only covered topics regarding matters of "the case," and that the right to counsel applied only to a discussion of the specifics of "the case," was incorrect as a matter of law, because it implied limitations on the right to counsel). However, here, Det. Needham's statement—"You have them, but you're still going to -- you understand them and you're still going to talk to me."—did not directly contradict Appellant's right to remain silent, nor did it place a limitation on Appellant's right to counsel. Thus, the court was correct in denying Appellant's motion to suppress.

II. **THE CIRCUIT COURT DID NOT ABUSE ITS DISCRETION WHEN IT ADMITTED THE VIDEO OF APPELLANT IN A JAIL UNIFORM AND THE PIECES OF VISUAL EVIDENCE DEPICTING PURCELL'S INJURIES.**

A. **Additional Facts**

*i. Interrogation Video of Appellant in a Jail Uniform*

In the same motion to suppress discussed *supra*, Appellant additionally moved to suppress the video of his interrogation on a separate ground—that he was clothed in a yellow jail uniform. At the suppression hearing, while testifying, Det. Needham described the uniform as yellow in color, confirming that it appeared as a short-sleeve V-neck top and a matching pair of pants, the material being akin to "scrubs style attire." Det. Needham also stated that Appellant was wearing a white T-shirt underneath his yellow shirt. At the end of the interrogation video, when Appellant stood to leave the interrogation room, "BCDC"—as in Baltimore City Detention Center—could be seen on the back of Appellant's shirt. Appellant moved to suppress the video on multiple grounds, that allowing the jury to view Appellant in his jail uniform: (a) undermined the presumption of innocence owed to him, and his right to a fair trial, violating his due process rights; (b) contained inadmissible evidence of other bad acts, violating Maryland Rule 5-404(b); and (c) was unfairly prejudicial, and that this unfair prejudice outweighed the video's probative value, violating Maryland Rule 5-403. [13]

Appellant requested and received a hearing on this matter. The State opposed the motion.

During the suppression hearing in November of 2022, a video recording of the interrogation was admitted into evidence and was played for the court. The circuit court

---

[13] In Appellant's motion, his arguments concerning prior bad acts and unfair prejudice centered on the statements he made while being interrogated by Det. Needham, rather than the issue of him wearing jail clothes. During the suppression hearing, Appellant extended those arguments to encompass the jail clothes as well.

20

then heard arguments from both Appellant's counsel and the State. Appellant's counsel argued that the interrogation video should be suppressed on the grounds raised in the filed motion to suppress. Appellant's counsel requested that as a remedy, the State not play the interrogation video as a video, but instead either play solely the audio recording from the video or provide a printed version of the interrogation. The State argued that the video should not be suppressed. The State asserted that it would not be obvious to the jury that the uniform Appellant donned was a jail uniform, contending that because it was yellow, it was not immediately identifiable as jail attire to the general public. The State noted that there was "no case law indicating that it would not be permissible to show someone dressed in this fashion during [an interrogation]." The State then offered to redact portions of the interrogation video that depicted identifying institutional letters—BCDC—which appeared on the back of Appellant's shirt. Notably, the State did redact the end of the recording which was the point at which the BCDC lettering was visible on the back of Appellant's shirt. Hence that lettering was never shown to the jury.

Subsequently, the court balanced the interrogation video's probative value against its prejudicial effect. In conducting the balancing test, the court noted that it could not find authority supporting the proposition that a person being interviewed either while "handcuffed or wearing some type of institutional attire [was] inherently prejudicial[.]" The court distinguished the facts here from cases where defendants were in trial "wearing either handcuffs visible to the jury or institutional attire[.]" In weighing the video's potential unfair prejudice, the court did not find Appellant's yellow jail uniform to be unfairly prejudicial because the uniform was "subject to a wide[] range of inferences," for

21

instance, medical scrubs, or that Appellant had just been taken into custody, "which a juror would expect given the nature of the interrogation." The court also noted that Appellant's jail uniform was not a jumpsuit—it was a shirt and pants, as opposed to one singular piece of clothing—which is more readily recognizable as prison attire.

The court denied Appellant's motion to suppress. The court found that there was "nothing inherently prejudicial" were a jury to view the video, and that the probative value of the video substantially outweighed any potential unfair prejudice. However, the court ordered that to the extent that there was any institutional lettering on the back of Appellant's shirt, the State must ensure that the lettering "not be identifiable in any way." Appellant's counsel noted a continuing objection.[14]

At trial in June of 2023, the State sought to admit the interrogation video where Appellant wore the yellow jail uniform. Appellant's counsel objected, stating that Appellant was not waiving the prior objections made during the suppression hearing. In renewing the objection, Appellant's counsel requested that the video portion of the interrogation be excluded and only the audio be played to avoid the jury viewing Appellant in jail attire. Noting Appellant's objection based on the previously raised issues, the court admitted the video. The video was then played in open court.

---

[14] In the interrogation video, in the context of the *Miranda* advisement, Det. Needham discussed with Appellant his highest level of schooling or education and gathered that Appellant had completed eleventh grade. The basis of Appellant's counsel's continuing objection was that it is not a logical presumption that someone with an eleventh-grade education could be a doctor or a nurse who might be wearing yellow scrubs.

### ii. Pieces of Visual Evidence Depicting Purcell's Injuries

In June of 2023, prior to trial, Appellant's counsel filed a motion *in limine* regarding the pictures and videos of Purcell's injuries which Appellant contended to be graphic. Appellant requested that the court either preclude the State from introducing such evidence, or in the alternative, limit the number of photographs and the manner in which they were to be presented at trial. Appellant argued that the pieces of visual evidence of Purcell's injuries were "highly prejudicial due to their graphic nature." At a motions hearing in June of 2023, Appellant's counsel indicated that the three pieces of graphic evidence were: Ofc. Carlone's—the first responding officer to The Spot—body worn camera footage; three photographs of Purcell taken by the forensic technician which depict Purcell's injuries, including blood; and autopsy photographs taken by an Assistant Medical Examiner of Purcell's injuries which depict the same wounds as the first set of pictures, cleaned up. The court reserved ruling on the motion, determining that it was best to address the visual evidence during trial, as exhibits were offered into evidence.

At trial, Appellant's counsel objected to the admission of these pieces of visual evidence on the grounds that the evidence was unfairly prejudicial to Appellant, and that this unfair prejudice outweighed the evidence's probative value. The court overruled each of these objections.

Regarding Ofc. Carlone's body worn camera footage, Appellant's counsel objected to the admission of this evidence and renewed the arguments from the motion *in limine*. Appellant requested that the court limit the number of times, and manner in which, the video was played for the jury. The court first found that the body worn camera footage was

relevant because it depicted both the nature and mechanism of Purcell's injuries and because it demonstrated the chaotic nature of the scene, which both parties discussed in opening statements. The court then engaged in the probative value versus unfair prejudice balancing test and found that "the visual representation of real-time imagery of what happened on this particular day [was] both relevant and admissible, and highly probative of all of the issues for which the fact finder . . . should reach a conclusion[.]" The court overruled the objection and confirmed with the State that it was going to stop displaying the body worn camera footage when Ofc. Carlone had finished testifying to limit the jury's viewing. The video was then admitted and played for the jury.

Regarding the photographs taken by the forensic technician of Purcell soon after he was pronounced deceased, Appellant's counsel objected to their admission at trial and renewed the arguments from the motion *in limine*. Appellant added that the photographs were also not relevant. The court disagreed, finding that because the photographs portrayed the cause and manner of death, they were relevant as to the potential degree of murder. The court then balanced the three photographs' probative value against the potential for unfair prejudice, finding that the probative value substantially outweighed the potential for unfair prejudice because the evidence was limited to three photographs. The court overruled the objection, admitted the photographs into evidence, and they were displayed for the jury.

As to the autopsy photographs taken by an Assistant Medical Examiner of Purcell's injuries, Appellant's counsel objected at trial, renewing a previous objection that the photographs were unfairly prejudicial. Appellant's counsel sought to exclude all of the photographs that Appellant contended were graphic, particularly one picture that showed

24

a pair of medical scissors pulling Purcell's eyelid approximately two inches off of his face to illustrate exactly where Purcell was shot. Neither party argued that the photographs were irrelevant; accordingly, the court addressed solely the photographs' probative value and potential prejudice. In overruling Appellant's objection, the court found that photographs were "limited in nature" and were probative of the manner and cause of the injury. Thus, the court held, there was no danger of unfair prejudice outweighing the photographs' probative value. The pictures were then admitted into evidence and published to the jury.

## B. Party Contentions

Regarding the interrogation video, Appellant contends that the circuit court abused its discretion by admitting the video, because the video depicted him in jail clothing, and thereby prejudiced the jury against Appellant.[15] Conceding that there is no Maryland case on this precise issue, Appellant raises the parallel issue of unfair prejudice resulting from the jury viewing a defendant in police identification (or mug shot) photos. Appellant relies on *Straughn v. State*, 297 Md. 329 (1983) in asserting that a court must carefully conduct a Maryland Rule 5-403 balancing test of mug shot photos before admitting such evidence, contending that we should follow the same process here for the interrogation video. Appellant further contends that the circuit court then improperly balanced the interrogation

---

[15] In his brief, Appellant contends that "Exhibit 14"—the *Miranda* Waiver—contained inadmissible evidence of other bad acts by indicating that Appellant had a criminal record, violating Maryland Rule 5-404(b). We first note that this was potentially a typographical error, and surmise that Appellant intended to reference Exhibit 15—the video of his interrogation. Appellant contends that the State failed to meet its burden to demonstrate the relevance of the interrogation video other than as evidence of "criminal character." We do not find this argument persuasive for the reasons explained *infra*.

video's probative value against its potential for unfair prejudice because the video implies, due to the presence of the jail uniform, that Appellant had a prior criminal history. Appellant disputes the State's argument that because Appellant's prison uniform was yellow it was not readily apparent as jail attire.[16]

As to the multiple pieces of visual evidence, Appellant contends that the circuit court abused its discretion when the contended graphic evidence was admitted: Ofc. Carlone's body worn camera footage, the bloody photographs of Purcell's injures taken by a forensic technician, and the cleaned-up autopsy photographs of Purcell's injuries taken by an Assistant Medical Examiner. Appellant asserts that these pieces of evidence were more prejudicial than probative due to their gruesome nature, citing images which depict Purcell lying in a pool of blood and Purcell's eye propped open via medical scissors.

The State contends that the circuit court correctly admitted the interrogation video. The State asserts that because Appellant's jail uniform was not clearly identifiable as prison attire, the jury's viewing of the video did not carry the danger of unfair prejudice. The State also asserts that it was entitled to have the jury see Appellant's "demeanor, expression, and body language during his statement" to the police, and thus a video format was preferable.

---

[16] Appellant also contends that this error was not harmless. The State contends that were we to find the court abused its discretion in admitting the video, any potential error was harmless because Appellant was restrained for the duration of the trial and did not object to the restraints. Because we determine that the circuit court did not abuse its discretion in conducting the Rule 5-403 balancing test, as will be discussed *infra*, we need not reach this contention.

As to the multiple pieces of visual evidence, the State contends that the circuit court properly exercised its discretion in admitting them. The State argues that the pieces of evidence were "unquestionably relevant," and probative regarding the degree of murder, which Appellant has challenged both at trial and on appeal. The State asserts that the circuit court correctly determined that the probative value of the evidence outweighed any potential unfair prejudice because although the evidence may have been inherently prejudicial as inculpatory evidence, Appellant failed to identify what exactly was *unfairly* prejudicial.

### C. Standard of Review

"Our review of the trial court's decision to admit evidence involves a two-step analysis." *Akers v. State*, 490 Md. 1, 24 (2025). First, we determine whether the evidence is relevant; this is a legal conclusion which we review *de novo*. *Id.* (citing *Montague v. State*, 471 Md. 657, 673 (2020)) (further citation omitted). If we determine that the evidence was relevant, then we proceed to the second step, and decide "whether the evidence is inadmissible because its probative value is outweighed by the danger of unfair prejudice[.]" *Id.* at 25. The second inquiry "is subject to the abuse of discretion standard[,]" *id.* (citing *Montague*, 471 Md. at 673–74), because the "final balancing between probative value and unfair prejudice is something that is entrusted to the wide discretion of the trial judge." *Newman v. State*, 236 Md. App. 533, 556 (2018) (quoting *Oesby v. State*, 142 Md. App. 144, 167 (2002)). An abuse of discretion occurs only when "no reasonable person would take the view adopted by the circuit court." *Montague*, 471 Md. at 674 (quoting *Williams v. State*, 457 Md. 551, 563 (2018)) (further citation omitted). The abuse of

27

discretion standard is highly deferential, so, "[t]he fact that we might have struck the balance otherwise is beside the point." *Newman*, 236 Md. App. at 556 (quoting *Oesby*, 142 Md. App. at 167).

### D. Analysis

"A central evidentiary principle in our legal system is that only relevant evidence is admissible." *Akers*, 490 Md. at 25; Md. Rule 5-402 ("[A] ll relevant evidence is admissible. Evidence that is not relevant is not admissible."). "Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Montague*, 471 Md. at 674 (quoting Md. Rule 5-401). "Having any tendency to make any fact more or less probable is a very low bar to meet." *Williams*, 457 Md. at 564 (internal quotation marks and citation omitted). However, relevant evidence may be excluded when its "probative value is substantially outweighed by the danger of unfair prejudice[.]" Md. Rule 5-403. When weighing the probative value of evidence against the danger of unfair prejudice, "this Court is mindful that prejudicial evidence is not excluded under Rule 5-403" merely because it hurts one party's case. *Montague*, 471 Md. at 674. Rather, the probative value of evidence "is substantially outweighed by unfair prejudice when the evidence 'tends to have some adverse effect . . . beyond tending to prove the fact or issue that justified its admission.'" *Id.* (quoting *State v. Heath*, 464 Md. 445, 464 (2019)) (further citation omitted).

*i. Interrogation Video of Appellant in a Jail Uniform*

1. Relevance

"A [video][17] is relevant if it assists the jury in understanding the case or aids a witness in explaining his testimony." *Thompson v. State*, 181 Md. App. 74, 95 (2008) (internal quotation marks, alterations, and citation omitted). Here, the interrogation video is undoubtedly relevant; Appellant even concedes so in his brief. The video had a "tendency to make the existence of" the fact that Appellant identified himself at The Spot on the night of Purcell's death, which was a "fact that is of consequence" in the case, more probable. *Montague*, 471 Md. at 674 (quoting Md. Rule 5-401). Further, this video assisted Det. Needham in explaining his testimony concerning his interrogation of Appellant and could have assisted the jury in understanding how a suspect was developed after nine months. *See Thompson*, 181 Md. App. at 95.

2. Probative Value and Risk of Unfair Prejudice

Maryland has yet to consider a case in which an appellant has challenged the admission of an interrogation video as unfairly prejudicial due to the defendant wearing prison or jail attire in the video. Because of this, Appellant compares this issue to a parallel one: whether unfair prejudice results from the admission of mug shot photographs. *See generally Straughn v. State*, 297 Md. 329 (1983). Appellant contends that admission of this

---

[17] The evidence discussed herein is in the form of both photographs and videos. Maryland law treats the evidentiary requirements for photographs and videos as essentially the same. *See Covel v. State*, 258 Md. App. 308, 323 (2023); *Jackson v. State*, 460 Md. 107, 116 (2018). Accordingly, we apply the law regarding photographs.

video was unfairly prejudicial because, like the appellant in *Straughn*, it could have "impl[ied] to the jury that he [had] a prior criminal record." 297 Md. at 333.

In *Straughn*, the Supreme Court of Maryland determined whether a trial court abused its discretion when it admitted a mug shot as substantive evidence of an extrajudicial photographic identification. *Id.* at 331. The Court held that when a trial court exercises its discretion, it "must balance the probative value of the mug shot[] against [its] prejudicial impact on the defendant." *Id.* at 334; *see* Md. Rule 5-403. In conducting this Rule 5-403 balancing test, the Court in *Straughn* rejected the defendant's proposal to apply a three-prong test as a set of "rigid prerequisites," as adopted by numerous federal courts.[18], and instead, opted to apply the three-prong test "as part of [the] balancing test to determine whether the prejudicial impact of the mug shots outweighed their probative value." *Straughn*, 297 Md. at 335–36. The three factors articulated in *Harrington* are: (1) that the State must "have a demonstrable need to introduce the photographs"; (2) if they are shown to the jury, the photographs "must not imply that the defendant has a prior criminal record"; and (3) when introduced at trial, the manner of introduction "must be such that it does not draw particular attention to the source or implications of the photographs." *United States v. Harrington*, 490 F.2d 487, 494 (2nd Cir. 1973).

The Court in *Straughn* held that the circuit court's admission of the mug shot photographs into evidence was not an abuse of discretion. 297 Md. at 336. The Court applied the Rule 5-403 balancing test—including the *Harrington* factors as part of its

_____

[18] *See*, *e.g.*, *United States v. Harrington*, 490 F.2d 487, 494 (2nd Cir. 1973).

analysis—weighing the mug shot photographs' probative value against their potential for unfair prejudice. *Id.* In conducting this balancing test, the Court found persuasive that: there was a real need for evidence; the photographic array of mug shots were introduced in an effort to corroborate a witness' in-court identification of the defendant, and not in an attempt to prejudice the defendant; the pictures were not referred to as "mug shots" in the presence of the jury; sanitizing[19] of the photographs took place outside of the presence of the jury; the jury was instructed to give no weight to the sanitizing of the photographs and "not to speculate about the kind of information that might be concealed"; and that when the mug shots were introduced, nothing about that introduction "called any particular attention to them." *Id.* at 336–37.

Here, we conclude the circuit court did not abuse its discretion; we determine this by independently conducting the same balancing test from *Straughn*, weighing the interrogation video's probative value against its potential unfair prejudice. To be sure, both the United States Supreme Court and the Supreme Court of Maryland have long recognized the harmful effect that presenting a defendant in prison or jail attire can have on a defendant's right to a fair trial. *See Estelle v. Williams*, 425 U.S. 501, 504 (1976); *see also Knott v. State*, 349 Md. 277, 286 (1998). However, we do not find that such harm was

---

[19] In cases concerning the admissibility and Rule 5-403 balancing of a mug shot photograph, courts have discussed the concept of "sanitizing." *See, e.g.*, *Arca v. State*, 71 Md. App. 102, 104 (1987). Sanitizing is the process by which, prior to showing a mug shot to the jury, pieces of the photograph are edited so as not to display carceral or penitentiary information or implications. For example, in *Arca*, a mug shot picture was "sanitized" to cover up a "chestplate containing identification numbers." *Id.* at 104.

31

present here. Just as in *Straughn*, there was a real need for the evidence. The interrogation video was the sole piece of identification evidence that placed Appellant at The Spot on the night of Purcell's death; during the interrogation, while Appellant and Det. Needham were watching the interior Nest footage, Appellant identified himself. There were no eyewitnesses, the gun was not recovered, and there was no DNA found at the scene other than Purcell's; therefore, Appellant's identification of himself at the scene of Purcell's murder carried significant probative value. Moreover, the video was introduced not only to show that Appellant identified himself at The Spot on the night of Purcell's murder, but also to provide the jury the opportunity to observe Appellant's demeanor, appearance, and level of comfort while being interrogated. This was important because whether Appellant's post-*Miranda* statements, including his self-identification, were voluntary was a question of fact submitted to the jury. Additionally, prior to trial, the State performed its own version of "sanitizing" akin to *Straughn*. *See* 297 Md. at 336–37. The State cut and redacted all portions of the interrogation video in which Appellant mentioned anything related to his then-current state of incarceration while awaiting trial, and the State redacted the end of the recording when Appellant stood up to exit the interview room; thus, the BCDC lettering on the back of Appellant's shirt was never shown to the jury. As in *Straughn*, the conversation regarding the redaction took place outside the presence of the jury, months prior to trial at the suppression hearing. *See id.* Therefore, the circuit court did not abuse its discretion in finding that the probative value of the video showing the interrogation of Appellant outweighed any potential unfair prejudice.

Additionally, other courts throughout the country have found evidence in which a defendant was wearing jail or prison attire to be admissible following a determination that the evidence's probative value outweighed its risk of unfair prejudice.[20] One such case—which is strikingly analogous to the present case—is *People v. Thames*, 467 P.3d 1181 (Colo. App. 2019). A jury convicted Thames of first-degree murder, among other offenses. *Thames*, 467 P.3d at 1185. One of the issues that Thames raised on appeal was that the trial court erred in permitting the jury to view a video of his interrogation, "because it showed

---

[20] *See Early v. State*, 872 S.E.2d 705, 709–10 (Ga. 2022) (holding that the trial court did not abuse its discretion when it determined that the probative value of a video of a defendant in a cell in which the defendant was wearing an orange jumpsuit and restrained by handcuffs, and then stated "I'm a murderer," was not outweighed by the danger of unfair prejudice when the statement was probative of the crime charged); *see also Commonwealth v. Gallaway*, 283 A.3d 217, 221, 234–35 (Pa. 2022) (holding that the trial court did not abuse its discretion when it determined that the probative value of a videotape showing the defendant in "bright red" prison clothing was not outweighed by the video's prejudicial effect because it showed the defendant making numerous false statements to the police which "evidenced" the defendant's "consciousness of guilt"); *Bramlett v. State*, 422 P.3d 788, 794–95 (Okla. Crim. App. 2018) (holding that the trial court did not abuse its discretion when it determined that the probative value of a video where the defendant was wearing an orange jumpsuit and handcuffs which appeared to be fastened to his body, was not outweighed by the danger of unfair prejudice, so that the jury could have the opportunity to observe the defendant's demeanor while being *Mirandized*); *State v. Taylor*, 240 S.W.3d 789, 795–97 (Tenn. 2007) (holding that a trial court did not abuse its discretion in determining that the probative value of a video where the defendant was "wearing prison garb"—an "inmate's jumpsuit"—outweighed the potential of unfair prejudice because the video was probative towards assisting the jury in assessing a witness's credibility); *Ritchie v. State*, 875 N.E.2d 706, 716, 718–19 (Ind. 2007) (holding that counsel for the defendant's failure to object to the admission of the defendant's media interview videos—where he was wearing jail clothing and wrist and ankle shackles—was not ineffective assistance of counsel because the defendant failed to establish how the videos' admission created actual prejudice against him). Additionally, all the defendants in these cases were charged with either murder or felony murder. *Early*, 872 S.E.2d at 710; *Gallaway*, 283 A.3d at 221; *Bramlett*, 422 P.3d at 791; *Taylor*, 240 S.W.3d at 791; *Ritchie*, 875 N.E.2d at 713.

him wearing prison garb." *Id.* at 1186. Thames contended that the publication of the video to the jury was an abuse of discretion because it "invited the jury to speculate about his criminal history because of his attire." *Id.* at 1191. The Colorado Court of Appeals disagreed, affirming the trial court's admission of the video into evidence. *Id.*

In the opinion, the court initially addressed a factual contention: "For purposes of this analysis, we assume the jury believed Thames was wearing a prison uniform during the [i]nterrogation, although the People contest this factual issue. The video showed him wearing green scrubs." *Id.* (parentheses omitted). As we discussed above, the same inferences were made here, that Appellant's yellow jail uniform resembled medical scrubs.

The *Thames* court held that "[t]he risk of prejudicing the defendant due to his clothing is not present when the jury is shown a video depicting the defendant in a prison uniform." *Id.* at 1191–92. The court contrasted Thames' interrogation video, which lasted one hour and fourteen minutes, with "the visual impact" of a defendant appearing in a prison uniform throughout trial, stating that the video "will not be a constant reminder of the defendant's condition or create a prejudicial, continuing influence in the jurors' minds." *Id.* at 1192 (internal quotation marks and citation omitted). The court also found persuasive that in the video of the interrogation, Thames was not restrained or handcuffed and was seated in what appeared to be a conference room. *Id.* Finally, the court did not find persuasive Thames' argument that the interrogation video was unfairly prejudicial because the prosecution modified the video "to blur [Thames'] prison identification badge and thereby improperly highlighted his incarceration[.]" *Id.*

The same holds true here. In the interrogation video, Appellant was not restrained or handcuffed, and Appellant was seated in what appeared to be a conference room. Due to redactions, the video that was published to the jury lasted one hour and sixteen minutes, nearly identical in length to the video in *Thames*. *Id.* Further, rather than blur an identification badge as occurred in *Thames*, here the State fully redacted the portions of the video in which either Appellant or Det. Needham mentioned Appellant's then-current state of incarceration and the end of the video where BCDC can be seen on the back of Appellant's shirt. Therefore, as in *Thames*, we agree that here, "[t]he risk of prejudicing the defendant due to his clothing is not present when the jury is shown a video depicting the defendant in a prison uniform." *Id.* at 1191–92.

Finally, Appellant argues that the circuit court abused its discretion in allowing the interrogation to be played as a video, rather than just as an audio recording—which Appellant's counsel offered as an alternative to excluding the video—to avoid the jury witnessing of Appellant in his yellow jail uniform. We disagree. "[T]he State is not constrained to forego relevant evidence and to risk going to the [factfinder] with a watered down version of its case." *Oesby*, 142 Md. App. at 166. Thus, we are satisfied that the circuit court properly exercised its discretion in admitting the video of Appellant's interrogation.

### ii. *Pieces of Visual Evidence Depicting Purcell's Injury*

#### 1. Relevance

Maryland courts have routinely found crime scene and autopsy photographs of homicide victims to be relevant towards a broad range of issues, "including the type of

wounds, the attacker's intent, and the modus operandi." *State v. Broberg*, 342 Md. 544, 553 (1996); *see, e.g.*, *Clarke v. State*, 238 Md. 11, 21–22 (1965); *Grandison v. State*, 305 Md. 685, 729–30 (1986); *Roebuck v. State*, 148 Md. App. 563, 600 (2002), *cert. denied* 374 Md. 84 (2003). Although inherently cumulative, the rationale for allowing photographic evidence to be presented in conjunction with verbal testimony is that in some cases, photographs present "more clearly than words" what a witness is describing. *See Broberg*, 342 Md. at 553–54 (quoting *Reid v. State*, 305 Md. 9, 21 (1985)); *see, e.g.*, *Johnson v. State*, 303 Md. 487, 503 (1985) ("We have previously held that photographs of the deceased are admissible even where the location of injuries was previously described and conceded by the defendant.").

Here, Ofc. Carlone's body worn camera footage, the photographs taken by the forensic technician of Purcell's bloody injuries, and the autopsy photographs of Purcell's injuries were relevant. The State's theory of the case was that Appellant and Purcell became involved in an argument inside of The Spot, which then continued outside of The Spot at the time when the two men exited the building, with Appellant so enraged that he shot Purcell one time, at pointblank range. These pieces of evidence assisted the jury in understanding the State's timeline of events and allowed the jury to visualize "the atrociousness" of Purcell's murder. *See Johnson*, 303 Md. at 502; *Thompson*, 181 Md. App. at 95–96 (holding that even cumulative photographs are admissible to assist the jury by illustrating relevant evidence or making it more tangible).

Additionally, the pieces of evidence also aided the witnesses' testimony. *See Thompson*, 181 Md. App. at 95. Ofc. Carlone's body worn camera footage aided his

36

testimony regarding his description of the scene as "chaotic" and regarding the state of Purcell's injuries when he arrived at the scene. The photographs taken by the forensic technician of Purcell at the hospital after he was pronounced deceased aided the forensic technician's testimony regarding the severity of Purcell's injuries. The autopsy photographs of Purcell's injuries, taken by the Assistant Medical Examiner, aided the Assistant Medical Examiner in explaining how he arrived at his ultimate conclusion in his report—that Purcell was shot at very close range.[21] This was relevant as to the degree of murder, because it depicted Purcell's injuries—particularly, that he was shot in the eye, and that the bullet exited his body through the back of his brain—which the State argued was evidence of premeditation, a necessary element of first-degree murder. Because the three pieces of evidence presented "more clearly than words," *Broberg*, 342 Md. at 553–54, the chaotic nature of the scene as described by Ofc. Carlone and Purcell's injuries as described by the forensic technician and the Assistant Medical Examiner, they satisfy the "low bar" of relevance. *Williams*, 457 Md. at 564.

---

[21] At trial, the Assistant Medical Examiner, Dr. Russell Alexander ("Dr. Alexander") testified that when the trigger of a gun is pulled, "other things," like gunpowder particles or burned gunpowder particles, will exit the barrel alongside the bullet. Dr. Alexander further testified that, "[i]f the end of the barrel of the gun is close enough to the person at the time the trigger is pulled, sometimes those gunpowder particles can strike the body around the entrance wound and make little red marks[,]" called stippling. According to Dr. Alexander, stippling was present in this case; it is also plainly visible to the untrained medical eye in the photographs taken by the forensic technician.

2. <u>Probative Value and Risk of Unfair Prejudice</u>

"[P]hotographs may be relevant and possess probative value even though they often illustrate something that has already been presented in testimony." *Broberg*, 342 Md. at 553; *see Grandison*, 305 Md. at 730; *Roebuck*, 148 Md. App. at 598. Additionally, "photographic evidence may be highly probative of the degree of murder." *Roebuck*, 148 Md. App. at 597; *Johnson*, 303 Md. at 502 ("On certain occasions, photographs have also been admitted to allow the jury to visualize the atrociousness of the crime—a circumstance of much import where the factfinder must determine the degree of murder."). Because circuit courts are vested with wide discretion in conducting a Rule 5-403 balancing test, the circuit court's decision "'will not be disturbed unless "plainly arbitrary," . . . because the trial judge is in the best position to make this assessment.'" *Ayala v. State*, 174 Md. App. 647, 679, *cert. denied* 401 Md. 173 (2007) (quoting *Broberg*, 342 Md. at 552).

Here, the circuit court properly exercised its discretion in determining that the probative value of the pieces of contested evidence outweighed any potential unfair prejudice. Each piece of evidence was highly probative as to the degree of murder because the degree of murder was a question of fact sent to the jury. *See Roebuck*, 148 Md. App. at 597. As to the unfair prejudice that Appellant alleges he suffered, we acknowledge that the contested evidence could be considered graphic. Ofc. Carlone's body worn camera footage depicts his arrival on the scene, his attempts to secure the scene, and his rendering of aid to Purcell. The photographs taken by the medical examiner of Purcell at the hospital depict Purcell's wounds and show a significant amount of blood. The autopsy photographs of Purcell depict Purcell's injuries, particularly where the bullet entered his eye and where the

bullet exited the backside of his skull. However, even considering the nature of these three types of evidence, the circuit court did not abuse its discretion when it determined that the probative value of the contested evidence did not unfairly prejudice Appellant.

The circuit court properly exercised its discretion when it balanced the probative value of Ofc. Carlone's body worn camera footage against its potential for unfair prejudice. The circuit court explained that body worn camera footage was "a real-time" video of the crime scene, and that it depicted both the nature and mechanism of Purcell's injuries. The circuit court explained that the "visual representation of real-time imagery" of what occurred was "highly probative of all of the issues" which the jury had to decide. We find no error in the circuit court's balancing. The body worn camera footage was probative on the issue of Ofc. Carlone's attempts to provide life-sustaining support to Purcell while awaiting the arrival of the paramedics. Ofc. Carlone's body worn camera footage was also probative as to his testimony regarding the "chaotic" scene that immediately followed the shooting of Purcell. Further, the body worn camera footage was probative as to the nature and severity of Purcell's injuries; in the video, Ofc. Carlone and other responding officers discussed where exactly in the parking lot of The Spot they believed Purcell to be shot, their thoughts on the type of gun used, the physical state of Purcell's eye when they arrived—particularly that it was coming out the socket and that there was some of Purcell's brain matter visible at the scene.

The circuit court properly exercised its discretion when it balanced the probative value of the photographs taken by the medical examiner of Purcell at the hospital against their potential for unfair prejudice. Relying on *Grandison v. State*, the circuit court

explained that photographs of a deceased victim are probative and that they do not unfairly prejudice Appellant solely because they depict bloody images of his injuries. 305 Md. at 729–30. The court further stated that because the State's theory of Purcell's death was "an execution with one shot at pointblank range," the specific photographs of the injury to Purcell's eye were probative. Finally, the court explained that because the evidence that depicted the bloodied injuries was limited to three photographs—out of the total of the nine admitted into evidence—rather than a larger amount, such as thirty, the photographs were not unfairly prejudicial. *See Roebuck*, 148 Md. App. at 597, 600 (holding that the circuit court did not abuse its discretion when it determined that the probative value of bloody photographs that depicted the victim's stab and gunshot wounds outweighed potential unfair prejudice).

The circuit court also properly exercised its discretion when it balanced the probative value of the autopsy photographs taken by an Assistant Medical Examiner of Purcell's injuries against their potential for unfair prejudice. The circuit court explained that several of the photographs were "representative of the person in terms of identification," and that they did not have "anything prejudicial about them." The court further stated that the autopsy photographs were "probative of the manner and cause of the injury," which was at issue for the jury, and that the autopsy photographs were also limited in nature. We find no abuse of discretion in the circuit court's determination. *See Ayala*, 174 Md. App. at 681 (holding that the circuit court did not abuse its discretion in determining that the probative value of autopsy photographs of the victim outweighed any

40

potential unfair prejudice because the autopsy photographs depicted the nature and severity of the victim's injuries).

Appellant asserts that because the identification of Purcell as the victim and the manner of Purcell's death were not contested issues, the medical examiner and autopsy photographs lacked relevance, and that their probative value was "minimal at best." Appellant's assertion is of no consequence. "[P]hotographs do not lack probative value merely because they illustrate a point that is uncontested." *Broberg*, 342 Md. at 554; *see also Evans v. State*, 333 Md. 660, 693, *cert. denied* 513 U.S. 833 (1994) (holding that autopsy photos were admissible despite a prior stipulation by the defendant to the facts). Thus, the circuit court did not abuse its discretion in admitting the three pieces of evidence.

### III. THE CIRCUIT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DETERMINED THAT THE NEST VIDEO FOOTAGE WAS AUTHENTICATED.

#### A. Additional Facts

At trial, and while Det. Needham was testifying, the State sought to admit two exhibits related to the Nest footage. The first exhibit was a communication from Nest in response to the search warrant from the Baltimore County Police Department which included a letter describing the process that a Nest custodian of records took to adequately and accurately respond to the search warrant, a Certificate of Authenticity ("the Nest Certificate"), and an attachment, which contained a list of hash values corresponding to the Nest footage.

The Nest Certificate was signed by a "Records Custodian," Joel Osagie ("Osagie"). In the Nest Certificate, Osagie certified:

41

1. I am authorized to submit this affidavit on behalf of Google LLC ("Google"), located in Mountain View, California. I have personal knowledge of the following facts, except as noted, and could testify competently thereto if called as a witness.

2. I am qualified to authenticate the records because I am familiar with how the records were created, managed, stored[,] and retrieved.

3. Nest provides hardware products to its customers, including the Nest Learning Thermostat, the Nest Protect Smoke + CO Detector, and the Dropcam Wi-Fi Video Monitoring Camera (which may include cloud video recording services).

4. Attached is a true and correct copy of records pertaining to Nest account(s) identified as 641666E0929E/7LVU0E, with Internal Ref. No. 5911726 ("Document"). Accompanying this Certificate of Authenticity as Attachment A is a list of hash values corresponding to each file produced in response to the Search Warrant.

5. The Document attached hereto is a record made and retained by Nest. Nest servers recorded the information provided by Nest automatically at the time, or reasonably soon after, it is entered or transmitted by the user, and this data was kept in the course of this regularly conducted activity and was made by regularly conducted activity as a regular practice of Nest.

6. The Document is a true duplicate of original records that were generated by Nest's electronic process or system that produces an accurate result. The accuracy of Nest's electronic process and system is regularly verified by Nest.

7. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

The second exhibit which the State sought to admit was the Nest footage,[22] which contained two video clips from the interior of The Spot and one video clip from the exterior

---

[22] These were some of the same videos shown to Appellant when he was interrogated by Det. Needham, as previously discussed. *See supra*, I.

of The Spot. The interior clips depicted people dancing, drinking, and smoking hookah, and the exterior clip depicted the murder of Purcell. When introducing this exhibit, the State asked Det. Needham questions to lay the foundation for the admission of the Nest footage. In response to those questions, Det. Needham testified that during his investigation, he returned to The Spot and discovered multiple surveillance cameras, from which he and other officers sought to obtain footage, to aid in developing a suspect. Det. Needham explained that he directed Detective Scott Young ("Det. Young") to go to The Spot and obtain serial numbers from the surveillance cameras located on the interior and exterior of The Spot, a task which Det. Young completed. Det. Needham further testified that, with the serial numbers obtained by Det. Young, a search warrant was obtained from the court. Det. Needham testified that the search warrant was issued to Nest, as it was the company that held the surveillance footage for The Spot. Det. Needham testified that Nest responded to the search warrant and provided electronic video footage, which he personally received.

Appellant's counsel objected to the admission of both the Nest Certificate and the Nest footage. Appellant's counsel argued that the Nest Certificate could not be authenticated because there was no witness to testify concerning its authenticity, and that the Nest footage could not be authenticated by Det. Needham.[23] Appellant's counsel argued that although the Nest Certificate explained that "Nest had provided video footage"

---

[23] Appellant is not challenging the Nest Certificate's authenticity on appeal. However, we discuss the Nest Certificate because it was used to authenticate the Nest footage.

and corresponding serial numbers, there had "been no testimony admitted about the significance of [each] serial number." Counsel further argued that there was nothing in the Nest Certificate that stated that the Nest Certificate pertained to the surveillance cameras from The Spot at its address, location, date, or time. Appellant's counsel then noted that there was no one scheduled to testify regarding who had maintained or installed the Nest cameras, and thus no one could connect the cameras to the address of The Spot.

The State responded that it intended to move to admit the Nest Certificate and footage as self-authenticating documents pursuant to Maryland Rule 5-902(12) because it complied with both Rules 5-902(12) and 5-803(b)(6). The State explained it provided to Appellant's counsel a notice of its intent to use the Nest Certificate as required by Rule 5-902 with its initial discovery in May of 2022, and again with the Nest footage as supplemental discovery in June of 2022.

The court held that because the State provided timely notice to Appellant's counsel of its intent to use the Nest Certificate as a self-authenticating document pursuant to Rule 5-902(12), the first requirement had been "complied with," and the only question left for the court to consider was whether the Nest Certificate met all the requirements of Rule 5-803(b)(6) as a business record.[24] The court then reviewed each requirement of Rule 5-803(b)(6) and ruled that the Nest Certificate complied with those factors, and was thus self-

---

[24] Although the circuit court stated that its determination of self-authentication was made pursuant to Rule 5-902, it did not specify that the rulings were made pursuant to 5-902(12) or (13). Based on the legal standards stated by the court and the procedure used in reaching its ultimate determination, we infer that the court was referencing each of these rules.

authenticating and admissible. Having determined that the Nest Certificate was self-authenticating, the court then determined that the Nest footage was authenticated under Maryland Rule 5-902(13). The court admitted both the Nest Certificate and footage, and both were published to the jury.

### B. Party Contentions

Appellant contends that the circuit court abused its discretion in admitting the Nest footage because the footage was not properly authenticated. Appellant further contends that the State "failed to adequately connect the three videos" to the case, and that the Nest Certificate "was simply not enough to overcome these gaps in the record." Finally, Appellant contends that this error was "decidedly prejudicial" due to the absence of other eyewitnesses or forensic evidence.

The State responds that the circuit court properly admitted the Nest footage. The State also contends that the three video clips—which comprise the Nest footage—were all a part of the same exhibit, and that that exhibit was supported by the Nest Certificate. The State asserts that Appellant relies "on a narrow view of the process for authenticating video footage," which has undergone substantial change since this trial due to the Supreme Court of Maryland's recent decision in *Mooney v. State*, 487 Md. 701 (2024). The State explains that under *Mooney*, video footage can be authenticated by circumstantial evidence.

In Appellant's reply to the State's brief, Appellant acknowledges *Mooney* but argues that *Mooney* does not "foreclose this issue on appeal, as there was insufficient evidence to authenticate the videos . . . even using circumstantial evidence."

### C. Standard of Review

"We review the trial court's authentication of evidence for an abuse of discretion." *Covel v. State*, 258 Md. App. 308, 322, *cert. denied*, 486 Md. 157 (2023) (citing *Gerald v. State*, 137 Md. App. 295, 304 (2001)). "A trial court abuses its discretion when 'no reasonable person would take the view adopted by the trial court,' or when the ruling is 'clearly against the logic and effect of facts and inferences before the court.'" *Prince v. State*, 255 Md. App. 640, 652 (2022) (quoting *King v. State*, 407 Md. 682, 697 (2009)).

### D. Analysis

Evidence must be authenticated as a condition precedent to its admissibility. Md. Rule 5-901(a). As we previously explained, our case law applies the same evidentiary requirements for photographs and videos. *See Covel*, 258 Md. App. at 323; *Jackson v. State*, 460 Md. 107, 116 (2018). "Because . . . videos are 'easily manipulated,' courts require authentication 'as a preliminary fact determination, requiring the presentation of evidence sufficient to show that the evidence sought to be admitted is genuine.'" *Reddick v. State*, 263 Md. App. 562, 579 (2024) (quoting *Washington v. State*, 406 Md. 642, 651–52 (2008)); *see also* Md. Rule 5-901(a) (explaining that the authentication requirement is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims").

#### i. Self-authentication

Some types of evidence are self-authenticating. *See* Md. Rule 5-902. When evidence is self-authenticating, it does not require testimony or other extrinsic evidence of its authenticity to be admitted. *Id.* One type of self-authenticating evidence is a certified record

that is generated by an electronic process or system, which is a record that "produces an accurate result, as shown by a certification of a qualified person[.]" Md. Rule 5-902(13). The certification must comply with the certification and notification requirements of Maryland Rule 5-902(12). *Id.* Maryland Rule 5-902(12) refers to a certified record of a regularly conducted activity. *See* Md. Rule 5-902(12). The Rule states:

> The original or a copy of a record of a regularly conducted activity that meets the requirements of Rule 5-803(b)(6)(A)–(D) and has been certified in a Certification of Custodian of Records . . . provided that, before the trial or hearing in which the record will be offered into evidence, the proponent (A) gives an adverse party reasonable written notice of the intent to offer the record and (B) makes the record and certification available for inspection so that the adverse party has a fair opportunity to challenge them on the ground that the sources of information or the method or circumstances of preparation indicate lack of trustworthiness.

*Id.* The term "certification" as employed in Rule 5-902(12) means a "written declaration under oath subject to the penalty of perjury." *State v. Bryant*, 361 Md. 420, 428 (2000) (quoting Md. Rule 5-902(b)).

We next turn to Maryland Rule 5-803 as directed by Rule 5-902(12). Rule 5-803 provides exceptions to the rule precluding hearsay. One exception is a record of a regularly conducted business activity. Md. Rule 5-803(b)(6). The rule explains that a "memorandum, report, record, or data compilation of acts, events, conditions, opinions, or diagnoses" is a record of a regularly conducted business activity if:

> (A) it was made at or near the time of the act, event, or condition, or the rendition of the diagnosis, (B) it was made by a person with knowledge or from information transmitted by a person with knowledge, (C) it was made and kept in the course of a regularly conducted business activity, and (D) the regular practice of that business was to make and keep the memorandum, report, record, or data compilation.

47

*Id.* The purpose underlying this exception is that because a business relied on the accuracy of its records during its daily operations, "the court may accept those records as reliable and trustworthy." *Dep't of Pub. Safety and Corr. Serv.'s v. Cole*, 342 Md. 12, 30 (1996). However, "[a] record of this kind may be excluded if the source of information or the method or circumstances of the preparation of the record indicate that the information in the record lacks trustworthiness." *Hall v. Univ. of Md. Med. Sys. Corp.*, 398 Md. 67, 84 (2007) (quoting Md. Rule 5-803(b)(6)).

<u>The Nest Certificate</u>

The Nest Certificate was a self-authenticating document. The circuit court properly exercised its discretion in determining that the Nest Certificate complied with Rule 5-902(12). The court inquired of the attorneys whether the Nest Certificate was provided in advance, both the day the State sought its admission and in advance of trial. The State noted that it provided Appellant's counsel with a notice of intent to use the Nest Certificate pursuant to Rule 5-902 as part of the State's initial discovery in May of 2022, and again with the Nest footage as supplemental discovery in June of 2022. Appellant's counsel conceded that she received the Nest Certificate and notice of the State's intent to use the Nest Certificate prior to trial. Therefore, the circuit court did not abuse its discretion when it determined that the first requirement of Rule 5-902(12) had been "complied with." *See* Md. Rule 5-902(12) (stating that the proponent must "(A) give[] an adverse party reasonable written notice of the intent to offer the record and (B) make[] the record and certification available for inspection"). The circuit court then explained that, as required by

Rule 5-902(12), a review of the requirements of Rule 5-803(b)(6) was warranted to ensure that the Nest Certificate was properly excepted from being hearsay.

The circuit court did just that. The court first stated that the Nest Certificate did "in fact" meet each of the requirements to demonstrate that the Nest Certificate certified that the Nest footage was a regularly conducted business activity. *See* Md. Rule 5-803(b)(6). The court explained that the Nest Certificate certified that the cameras at The Spot "record the information at the time or reasonably soon thereafter" the recording occurs. *See* Md. Rule 5-803(b)(6)(A) (a video recording is a record of a regularly conducted business activity if "it was made at or near the time of the act, event, or condition"). The court next stated that the Nest footage was a "record[] retained by Nest[.]" *See* Md. Rule 5-803(b)(6)(B) (a video recording is a record of a regularly conducted business activity if "it was made by a person with knowledge or from information transmitted by a person with knowledge"). Moreover, the Nest Certificate provided that Osagie was "qualified to authenticate the records" because he was "familiar with how the records were created, managed, stored[,] and retrieved." The court explained that the Nest footage was collected "in the course of [a] regular[ly] conducted activity" in the regular practice of the business. *See* Md. Rule 5-803(b)(6)(C) (a video recording is a record of a regularly conducted business activity if "it was made and kept in the course of a regularly conducted business activity[.]"). Finally, the court explained that it was Nest's regular "practice" and "conducting of business" to make and keep the footage. *See* Md. Rule 5-803(b)(6)(D) (a video recording is a record of a regularly conducted business activity if "the regular practice of that business was to make and keep" the recording). The court also noted that the records

49

were transmitted approximately one year ago; that the Nest footage was "a true duplicate of the original records that [were] generated"; and that the Nest Certificate was made by "the custodian of records . . . at or near the time of the activity." Thus, the court properly exercised its discretion when it determined that the Nest footage was self-authenticating and thus admissible.

The Nest footage

Moreover, the circuit court did not abuse its discretion when it determined that the Nest footage was authenticated as a self-authenticating record pursuant to Maryland Rule 5-902(13). The Nest cameras are generated by an electronic process or system, as they are recording devices. The Nest footage was offered with the Nest Certificate. *See* Md. Rule 5-902(13) (an electronic process which produces a record must be "shown by a certification of a qualified person" to produce an accurate result). As directed by Rule 5-902(13), the court appropriately addressed Rule 5-902(12), which we discussed above. Thus, the circuit court properly exercised its discretion in determining that the Nest footage was self-authenticating under the procedure required by Rule 5-902(13).

The circuit court did not abuse its discretion when it decided that the video footage was properly authenticated. Just as the Supreme Court of Maryland has explained that video footage can be authenticated in "different ways under the rules governing authentication," including a "combination" of methods, the same holds true here. *Mooney*, 487 Md. at 730. The Nest footage was sufficiently authenticated by a combination of (1) the self-authenticating Nest Certificate and (2) the Nest footage, which was itself self-authenticating.

50

*ii.* Mooney v. State

Although we are satisfied that the Nest footage was properly admitted as self-authenticating, because both Appellant and the State present argument regarding *Mooney*, we briefly address it herein.[25] In *Mooney*, the defendant alleged that a video of a shooting, which was recorded by a Ring camera, was not properly authenticated because there was no witness from Ring who testified at trial and because the victim-witness did not observe the entirety of the assault depicted in the video. *Mooney*, 487 Md. at 712, 716. The Supreme Court of Maryland held that "[t]here need not be a witness with personal knowledge of every single event depicted in a video for the video to be authenticated." *Id.* at 730. It held that "[v]ideo footage can be authenticated in different ways under the rules governing authentication, including through the testimony of a witness with knowledge under Maryland Rule 5-901(b)(1), circumstantial evidence under Maryland Rule 5-901(b)(4), or a combination of both[.]" *Id.* The Court stated that "[w]hat matters is that the proponent of the video must demonstrate that the evidence is sufficient for a reasonable juror to find by a preponderance of the evidence that the video is what it is claimed to be." *Id.*

We note that here, Det. Needham testified regarding the circumstances under which the Nest footage was obtained, including: that he identified Nest cameras at The Spot which contained serial numbers; that the Nest footage was obtained based on a search warrant;

---

[25] *Mooney* was not yet decided at the time of Appellant's trial. However, "in the overwhelming majority of cases, a judicial decision sets forth and applies the rule of law that existed both before and after the date of the decision[.]" *State v. Daughtry*, 419 Md. 35, 77 (2011) (quoting *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 535 (1991)). Thus, we may rely on *Mooney*.

that the Nest footage had not been altered in any way by him or any other police personnel; that the Nest footage was in the same form as the form in which he received it; and that the Nest footage contained "multiple video clips from inside and outside of The Spot[.]" Det. Needham also testified that once he obtained the Nest footage from The Spot, he reviewed the footage to "identify the subjects that were depicted on the video surveillance."[26] Thus, there was sufficient evidence "for a reasonable juror to find by a preponderance of the evidence that the video is what it [was] claimed to be"[27]—i.e., surveillance footage from The Spot on the night Purcell was shot.[28]

### iii.   Other assertions of unreliability

Finally, we address an issue that is a primary concern of Appellant regarding authenticity. Appellant claims that there were "gaps in the record" which prevent a connection from the Nest cameras to the footage. Appellant emphasizes that Det. Needham did not testify regarding the serial numbers found on the cameras at The Spot, and thus, there was a lack of connection between the cameras at The Spot and the Nest footage.

---

[26] Although not discussed by the trial court in its authentication analysis, we note that during his interview with Det. Needham, Appellant identified himself in portions of the Nest footage.

[27] *Mooney*, 487 Md. at 730.

[28] While we conclude that the Nest footage was authenticated under *Mooney*, we are cognizant of the caution raised by Chief Justice Fader's concurrence that "[c]ourts should be alert to claims that evidence has been altered by the use of artificial intelligence[.]" 487 Md. at 735 (Fader, C.J., concurring). As in *Mooney*, "the record in this case does not contain any hint that artificial intelligence may have played a role[;] nor was there any suggestion that the video may have been altered in any way." *Id.* at 735–36 (Fader, C.J., concurring).

Further, Appellant asserts that the two video clips from the interior of The Spot were "especially problematic" because, Appellant argues, the two clips lack a visible date and time stamp, and because there was a dearth of testimony regarding the collection of the video clips. Overall, Appellant alleges reliability and trustworthiness, as to the Nest footage, were not sufficiently established.

We disagree. The Nest footage was authenticated via the Nest Certificate, itself through self-authentication, and circumstantial evidence from Det. Needham's testimony. As we explained *supra*, both were admitted pursuant to Maryland Rules 5-902(12)–(13) and 5-803(b)(6). A trial court may deny a business record's admission into evidence, if the business record, here the Nest footage, is established to be unreliable or untrustworthy. *See Owens-Illinois, Inc. v. Armstrong*, 326 Md. 107, 114–15, *cert. denied* 506 U.S. 871 (1992). Factors included in a reliability and trustworthiness determination include the following: whether the records were made in anticipation of litigation; whether there was motive to falsify the records; how "routine or non-routine" the record was; "how much reliance the business places on the record for business purposes"; and if the record contains opinions and conclusions, whether those opinions and conclusions are valid or speculative. *Jun v. State*, 265 Md. App. 459, 480 (2025) *cert. granted*, No. 29, Sept. Term 2025 (Md. Aug. 20, 2025) (quoting *Armstrong*, 326 Md. at 115).

Applying those factors to the case before us, we see no basis to conclude the Nest footage was untrustworthy or unreliable. Nest is not a party to the litigation. There is no evidence in the record to suggest that Nest had a reason to falsify the recordings. As explained in the Nest Certificate, Nest records and saves the footage nearly

53

contemporaneously to the time footage is recorded by a Nest camera. The Nest footage was produced by Osagie, a custodian of records for Nest, who declared under the penalty of perjury that everything discussed in the Nest Certificate regarding the Nest footage was true and correct to the best of his knowledge. The Nest footage was produced in response to a search warrant requesting the recordings from The Spot's cameras on May 16, 2021. Despite Appellant's assertions that the Nest footage was untrustworthy and unreliable, the record does not support such a conclusion. Accordingly, the circuit court properly exercised its discretion when it determined that the Nest footage was authenticated.

## IV. THE EVIDENCE WAS SUFFICIENT TO CONVICT APPELLANT OF FIRST-DEGREE MURDER.

### A. Additional Facts

Appellant's jury trial began in June of 2023. Following opening statements, the State proceeded with its case in chief, during which it called seven witnesses.[29]

#### i. Evidence Presented at Trial

First, the State called Ofc. Carlone. Ofc. Carlone was the first responding officer to The Spot. Ofc. Carlone testified regarding the "chaotic" nature of the scene when he arrived, and the steps he took to try to secure the "irate" crowd and preserve the crime scene. Ofc. Carlone also testified concerning the paramedics' arrival and departure from the scene and to the condition in which he found Purcell. During Ofc. Carlone's testimony,

---

[29] Although the State called seven witnesses, only six of those witnesses provided testimony. See *supra* n.8.

on the State's motion, the court admitted Ofc. Carlone's body worn camera footage and Ofc. Carlone testified regarding the events depicted therein.

The State next called Chelsea Bradenburg ("Bradenburg"), an EMT with the Baltimore County Fire Department. Bradenburg testified concerning the nature of the crowd, and the steps that she and other EMTs and paramedics took to render aid to Purcell. Bradenburg testified that Purcell was pronounced deceased upon arrival to the hospital.

The State then called Jacquelyn Wright ("Wright"), a Forensic Services Technician who was employed at the time by the Baltimore County Police Department's crime lab. Wright testified as to the procedures she followed when she analyzed the scene at The Spot and testified regarding how she collected evidence. Wright also testified concerning the photographs she took at the hospital of Purcell.[30]

The State next called Dr. Alexander, the Assistant Medical Examiner who completed the autopsy report concerning Purcell. Dr. Alexander was qualified as an expert in the field of forensic pathology. He testified regarding the autopsy photographs he took of Purcell.[31] Dr. Alexander testified as to his professional opinion regarding Purcell's injuries; he explained that the injuries around Purcell's eye indicated "stippling," a process in which gunpowder particles—which come out of the barrel of a gun when it is fired— can strike the body and make "little red marks" if the barrel of the gun is close enough to a

---

[30] These include the same hospital photographs that are the subject of our discussion in Issue II.

[31] These are the same autopsy photographs that are the subject of our discussion in Issue II.

person at the time the trigger is pulled. Dr. Alexander further testified that in his expert opinion, because Purcell had stippling around his eye, the gun had to be "anywhere from a fraction of an inch or so out to three to five feet" from Purcell when it was fired. Dr. Alexander also testified that, to a reasonable degree of medical certainty, his opinion was that the manner of Purcell's death was homicide.

The final witness called by the State was Det. Needham. Det. Needham testified regarding the crime scene photographs captured by Wright and identified Purcell as the victim. Det. Needham further testified concerning the steps of the investigation into the murder of Purcell that ensued following the initial response to The Spot. Det. Needham explained that upon leaving the scene, he went to the hospital to see Purcell; left the hospital and returned to police headquarters; and performed investigatory steps on his computer at headquarters. Det. Needham testified regarding the physical evidence that was recovered from the scene which included one shell casing, one "jacketing," and one bottle of lotion. Det. Needham testified that during the investigation, law enforcement never recovered the weapon used to shoot Purcell.

Det. Needham additionally testified regarding his interrogation of Appellant, the facts of which we explained in detail above. *See supra* I.A. The video of the interrogation was admitted and played for the jury. In the recording of Det. Needham's interrogation of Appellant, Det. Needham played the Nest footage from the interior and exterior of The Spot for Appellant. While watching the interior Nest footage, Appellant identified himself; however, while watching the exterior Nest footage, Appellant declined to identify the individual who appeared to be the same person that he earlier identified as himself.

56

### ii. Motion for Judgment of Acquittal

On the fourth day of trial, the State completed the presentation of its case in chief. Outside the presence of the jury, counsel for Appellant moved for judgment of acquittal.[32] The thrust of Appellant's counsel's argument was that the State did not prove beyond a reasonable doubt the element of premeditation. Appellant's counsel noted to the court that for a killing to be premeditated, the State must establish that the killing was "not a merely impulsive act." Appellant's counsel commented on the absence of evidence of motive on the part of Appellant, and on the absence of other forms of evidence, stating that "there [was] really sparse evidence about what the circumstances were when this occurred," and that there were no eyewitnesses.

In response, the State emphasized that "there is not a particular length of time to be attributed to premeditation." The State noted that one of the exhibits—an interior video of The Spot—depicted Appellant entering The Spot, Appellant and Purcell interacting, Purcell exiting The Spot, and then Appellant exiting The Spot, following Purcell. The State argued that Appellant was already "performing his premeditation at that point." The State highlighted that Appellant was armed and that he followed Purcell out to the sidewalk, continuing a conversation with him. The State further contended that "[a]ll of [that was] plenty of time for [Appellant] to consider his next move, [to] decide whether or not to kill"

---

[32] Appellant moved for a judgment of acquittal as to all counts. On appeal, Appellant only challenges the sufficiency of the evidence for the first-degree murder conviction.

Purcell. Subsequently, the State requested that the court deny the motion for acquittal and that the count of first-degree murder be forwarded to the jury.

The court denied Appellant's motion, stating: "At the particular stage where we are currently and given the evidence that has been generated, the [c]ourt does find that a *prima facie* case has been [met] to submit the issues to the [j]ury for the factual determinations[.]"

Appellant did not testify and called no witnesses. The defense rested and renewed the motion for judgment of acquittal as to all counts and with the arguments previously stated. The court denied the renewed motion. Consequently, the count for first-degree murder was sent to the jury. The jury found Appellant guilty of that offense.

## B. Party Contentions

Appellant contends that no reasonable juror could have found him guilty of first-degree murder beyond a reasonable doubt because, even taking the evidence in the light most favorable to the State, there was no evidence of premeditation.[33] Appellant further contends that: there was no evidence of his motive; there was no evidence of him having any relationship with Purcell; and there was no evidence in the form of witness testimony as to his intentions or the course of his actions. Appellant asserts that the only evidence available to the jury that could have supported his conviction was the Nest footage, but that "the videos by themselves do not prove premeditation."

---

[33] Appellant does not address the other elements of first-degree murder, limiting his contention to premeditation alone. As such, from here forth, we only address that element of first-degree murder.

The State contends the opposite; the State asserts that "the evidence sufficed to support a first-degree murder conviction." The State asserts that—contrary to what Appellant argues—it was not required to prove motive. The State also argues that it established premeditation, explaining that ahead of the shooting, Appellant formed an intent to shoot, not from a mere momentary lapse in judgment, but rather "an ahead-of-time decision after the men argued" in The Spot. The State acknowledges that the encounter between Appellant and Purcell was "fleeting," lasting only three minutes and six seconds, but that this was legally sufficient for Appellant to form an intent to kill.

### C. Standard of Review

"When reviewing the sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the State and assess whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Krikstan*, 483 Md. 43, 63 (2023) (internal quotation marks and citation omitted). "Our role is not to review the record in a manner that would constitute a figurative retrial of the case." *Id.* This is because the factfinder is in the "unique position" to view the evidence and the witnesses firsthand and assess their credibility. *Id.* (citing *Walker v. State*, 432 Md. 587, 614 (2013)). Accordingly, "we do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence[,]" *id.* at 63–64 (quoting *Walker*, 432 Md. at 614), and we give deference to "reasonable inferences drawn by the factfinder . . . because '[w]e do not second-guess the jury's determination where there are competing rational inferences available.'" *Id.* at 64 (quoting *Smith v. State*, 415 Md. 174, 183 (2010)). This standard "applies to all criminal cases, including those resting upon circumstantial

evidence, since, generally proof of guilt based in whole or in part on circumstantial evidence is no different from proof of guilt based on direct eyewitness accounts." *State v. Smith*, 374 Md. 527, 534 (2003); *see Pinkney v. State*, 151 Md. App. 311, 329 (2003) (explaining that circumstantial evidence alone can provide a sufficient basis for a factfinder to find guilt, "even for [first-degree] murder").

### D. Analysis

First-degree murder is "a deliberate, premeditated, and willful killing[.]" Md. Code (2002, 2021 Repl. Vol.), Criminal Law Article § 2-201(a)(1). The legal definitions of these words are "well settled." *See Tichnell v. State*, 287 Md. 695, 717 (1980); *see also Evans v. State*, 28 Md. App. 640, 658 (1975).

> For a killing to be ["willful"] there must be a specific purpose and intent to kill; to be "deliberate" there must be a full and conscious knowledge of the purpose to kill; and to be "premeditated" the design to kill must have preceded the killing by an appreciable length of time, that is, time enough to be deliberate.

*Tichnell*, 287 Md. at 717. "As to the elements of 'premeditation' and 'deliberation,' this Court has noted that the two elements are often reviewed together." *Wood v. State*, 209 Md. App. 246, 318 (2012); *see also Pinkney*, 151 Md. App. at 335 (explaining that the elements of deliberation and premeditation are often "treated as a single endeavor").

"[I]f the killing results from a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder." *Pinkney*, 151 Md. App. at 335 (quoting *Willey v. State*, 328 Md. 126, 133 (1992)); *cf. Mitchell v. State*, 363 Md. 130, 149 (2001) (holding that a murder "committed solely on impulse—the immediate offspring of rashness and

60

impetuous temper—is not one committed with deliberation and premeditation") (internal quotation marks omitted). "[P]remeditation may be established circumstantially from the facts of a particular murder." *Wood*, 209 Md. App. at 318 (internal quotation marks and citation omitted). In fact, premeditation usually "is not established by direct evidence." *Hagez v. State*, 110 Md. App. 194, 206 (1996).

Here, viewing the evidence in the light most favorable to the State, the evidence was sufficient for a rational juror to determine beyond a reasonable doubt that Appellant acted with premeditation in killing Purcell. *Krikstan*, 483 Md. at 63. The record reflects the following pieces of evidence were submitted to the jury: the Nest footage; the interrogation video of Appellant; Det. Needham's testimony; Ofc. Carlone's body worn camera footage; Dr. Alexander's testimony; Wright's crime scene photographs of Purcell; and Dr. Alexander's autopsy photographs of Purcell.

We first address the Nest footage. In the interior Nest footage, Appellant can be seen having a conversation with Purcell, and then subsequently following Purcell outside. When they appear outside, Purcell and Appellant have a brief conversation, lasting less than two minutes, before Appellant retrieves a gun and shoots Purcell one time in the eye at pointblank range. Viewing this evidence in the light most favorable to the State, a rational juror could have found that the time from Purcell's and Appellant's exit from The Spot to the time just prior to Appellant's reach for the gun—approximately three minutes—was sufficient time for Appellant to premeditate the shooting of Purcell. *Tichnell*, 287 Md. at 717–18 ("It is unnecessary that the deliberation or premeditation shall have existed for any particular length of time."); *see Hounshell v. State*, 61 Md. App. 364, 373 (1985) (stating

that for a killing to be premeditated, there need not have been an appreciable space of time between the intention and the act: "they may be as instantaneous as successive thoughts of the mind") (internal quotation marks and citation omitted); *Wood*, 209 Md. App. at 318 (explaining that premeditation may be established circumstantially from the facts of a particular murder).

Additionally, Ofc. Carlone's testimony and body worn camera footage, Dr. Alexander's testimony and autopsy photographs of Purcell, and Wright's hospital photographs of Purcell likewise demonstrate the element of premeditation and deliberate choice. This evidence illustrates the intensity of Purcell's injuries and depicts or explains the "intensity" of Purcell's wounds and "brutal manner" in which Purcell's wounds were inflicted, which can provide sufficient evidence of deliberation and premeditation. *Purnell v. State*, 250 Md. App. 703, 715 (2021) (citing *Kier v. State*, 216 Md. 513, 523 (1958)). For example, Dr. Alexander's testimony, particularly his statements regarding "stippling,"—which is an injury only suffered when a victim is shot by a gun as far as five feet away and as close as a fraction of an inch away—was sufficient evidence for a reasonable juror to conclude that the "brutal manner" in which Appellant shot Purcell demonstrated premeditation and deliberate choice. Ofc. Carlone's body worn camera footage, Wright's hospital photographs, and Dr. Alexander's autopsy photographs also depict the intensity of Purcell's injuries—specifically that he was shot in the eye and that the bullet exited through the back of his skull, and that Purcell died almost instantaneously due to the type of gunshot wound and amount of blood lost. The evidence was sufficient for a rational juror to conclude that Appellant had premeditated the murder of Purcell.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**